[No. B225943. Second Dist., Div. Seven. Nov. 23, 2010.]

In re DAVID ALLEN TWINN on Habeas Corpus.

## COUNSEL

Nancy L. Tetreault, under appointment by the Court of Appeal, for Petitioner David Allen Twinn.

Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, Julie A. Malone and Ryan K. Schneider, Deputy Attorneys General, for Respondent State of California.

## OPINION

**WOODS, J.**—David Allen Twinn filed a petition for writ of habeas corpus seeking an order (1) overturning the Governor's 2010 decision to reverse the Board of Parole Hearings's (the Board) 2009 order granting him parole and (2) reinstating of the Board's parole release order. In 1992, Twinn was sentenced to an indeterminate term of 15 years to life in state prison for second degree murder. The Board found Twinn suitable and granted parole in 2006, 2008 and 2009. On each occasion the Governor, exercising his authority under article V, section 8, subdivision (b), of the California Constitution and Penal Code section 3041.2, reversed the Board's decision. In July 2010, Twinn filed the instant petition in which he argued, inter alia, that the Governor's 2010 reversal was not supported by "some evidence" that he currently posed an unreasonable risk of danger to society if released and thus violated his right to due process. He specifically argues that the Governor relies on evidence taken out of context and outdated evidence, including old psychological evaluations, to conclude erroneously that he lacks insight into his crimes and has not accepted full responsibility for his actions. Twinn further asserts the Governor has no evidence to support the finding that he lacks viable parole plans. Twinn also complains the Governor has failed to establish a nexus between the commitment offense and his current dangerousness. As we shall explain more fully below, we agree with Twinn. In our view, although there is a modicum of evidence to support the Governor's finding that in the past Twinn had minimized his role in the victim's demise, other evidence the Governor relies upon to justify the reversal of the Board's decision lacks a rational basis in fact. In addition, the identified facts that do find support in the record are not probative to the central issue of current dangerous when considered in light of the full record. Accordingly, we grant relief.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Twinn's Background.

Twinn was born in 1972 and grew up in a "gang-infested" area of Venice, California. He has nine siblings. Twinn's father abused alcohol and his mother was a nurse; Twinn stated that his parents had an unstable relationship and separated a number of times, but never divorced. Twinn reported that his father "was not always around," and therefore, Twinn had a childhood with "a lot of responsibility" to take care of his siblings as well as a bedridden aunt. As a result, Twinn stated he had a lot of anger and he reported that he looked to his friends and street gangs to serve as a surrogate family. He was involved in a gang, the Venice Shoreline Crips from ages 13 to 16, but he denied he was involved in any serious violence in connection with that gang; he described himself as "not a very good" or active gang member. Twinn stated that he left the gang when he was 16 and moved to Fresno to live near his mother.

In 1987, when Twinn was 14 years old, a juvenile delinquency petition was sustained against him for grand theft of an automobile, and he was committed to community camp. Twinn described that offense as "joyriding." In 1989, another petition was sustained against Twinn and he was again sent to community camp for "robbery, armed with a deadly weapon, and taking a vehicle without the owner's consent." Twinn explained that the 1989 offense involved his failure to return a car to a person who had "rented" it to him in exchange for money to buy drugs. Twinn was on probation at the time of the commitment offense.

### B. The Commitment Offense.

On the morning of June 16, 1990, Irma Blockman (Twinn's stepbrother's aunt) was collecting bottles on the street in Venice.[1] She saw a couple of bottles near a trio of men who stood on a corner. When she approached intending to pick up the bottles, one of the men, the victim, Curtis Golder, who appeared to be intoxicated, stopped her and an argument ensued. Blockman was under the influence of cocaine at the time. Blockman walked away. A short time later Blockman saw what she thought was an abandoned shopping cart with clothes and other items in it. Blockman took the cart and began to walk home. Golder stopped her again and told her the shopping cart belonged to him. Golder punched Blockman in the eye and she hit him with a bottle. Golder then knocked Blockman down. Blockman got up from the ground and walked home.

---

[1] The facts relating to the commitment offense are taken from the 1995 appellate opinion in which this court affirmed Twinn's conviction.

That night Blockman was at her mother's house, when Twinn, who was 17 years old at the time, and Blockman's nephew Julius Yates learned what had transpired between Blockman and Golder earlier in the day. Twinn and Yates decided to retaliate by beating up Golder. They approached Golder on the street and struck Golder with their fists and feet. It was also alleged at trial that they struck Golder with a piece of wood.[2] They beat Golder for five to 10 minutes, even after Golder fell to the ground and did not resist. Either Twinn or Yates also threw a shopping cart on Golder. Yates and Twinn fled; Twinn believed that Golder was still alive when they left.[3] In the beating Golder suffered fractured ribs, abrasions, and lacerations to his face, head, hand and lower body. Golder was pronounced dead at the scene.

Twinn was arrested and charged with second degree murder in violation of Penal Code section 187. During the trial, the medical examiner testified that the *immediate* cause of Golder's death was arteriosclerotic disease of the heart (i.e., obstructed arteries). Nonetheless, the medical examiner also concluded that the blunt force injuries from the beating contributed to his death. In 1992, Twinn was convicted and sentenced to 15 years to life. He was initially housed in the California Youth Authority.

Twinn and Yates appealed their convictions, claiming various instructional errors and that insufficient evidence supported a finding of malice afore-thought and use of a dangerous weapon. They argued that there was insufficient evidence that they intended to kill Golder, and that but for Golder's heart condition, their actions would not have caused Golder's death. This court rejected the contentions and affirmed the judgment.

### C. *Postconviction Conduct.*

During Twinn's almost two decades in prison, Twinn obtained his high school diploma, worked in various trades including welding and carpentry, participated in vocational courses and has participated in educational and self-help programs. While in prison he has served as chair of the NA (Narcotics Anonymous) and AA (Alcoholics Anonymous) programs and continued to follow the 12-step program. Although nothing in his record shows that he has a substance abuse problem, Twinn noted that he enjoyed being involved in the programs.

---

[2] Evidence was presented at trial that Golder sustained injuries as a result of being struck by a piece of wood. There was also evidence presented during the trial that on the afternoon of Golder's death he got into a fight with another person who struck Golder repeatedly with a two-by-four piece of wood. The jury rejected a specific allegation that Twinn used a "stick" as a deadly weapon. At the 2006 parole hearing, Twinn told the Board that Yates carried a stick that day.

[3] Twinn has always maintained that he did not intend to kill Golder.

Twinn has also served as a literacy volunteer and as a mentor and speaker for Phoenix House. He has also worked with an instructor in the prison vocational program to develop financial planning materials for fellow inmates to teach them about life skills in banking, credit cards and investment plans.

All of his psychological assessments have found him to be a low risk of dangerousness, and he has not been found to have suffered from any psychological or mental disorders.

Twinn's first mental evaluation was conducted in 1995. According to the evaluator's report, Twinn revealed that when he was 14 or 15 years old he had ingested more than a gram of cocaine to "avoid arrest" and as a result lost consciousness and was hospitalized for a few days. When asked about the commitment offense, Twinn told the evaluator that he was appealing his conviction and was "innocent of the charges of murder" and further stated that he was advised by counsel not to discuss the offense and therefore refused to discuss the circumstances of the crime. The evaluation further reflected that Twinn had not had any behavior problems while incarcerated or institutional disciplinary problems; that he had been working in a warehouse trade and had obtained a certificate as an office clerk.

Twinn's 2000 psychological evaluation reflected that while describing the commitment offense, Twinn stated that the victim suffered from heart disease and had a heart attack when Twinn and Yates attacked him. Twinn also told the evaluator that he was "offered six years since the death was accidental but I didn't take it . . . . I should have taken the deal when I was a juvenile but I was scared." The report further indicated that Twinn had made impressive gains while in prison and had matured considerably.

In 1999 Twinn married a friend he had known since he was a teenager and has a child from the marriage.

Twinn's 2008 psychological evaluation indicated that Twinn discussed how he had changed since he had been incarcerated, how he had adopted a "better value system" and had learned to deal with stress and anger. In discussing the commitment offense, he told the evaluator that he and Yates "jumped [Golder] and he died of a heart attack and because of the beating . . . the fight made [Golder] too excited . . . ." Twinn also stated that at the time he thought he was "protecting" Blockman, whom he considered to be a family member. Twinn indicated that on an occasion prior to the crime he had failed to protect his sister during some incident and that the prior situation with his sister had stayed in his mind. He stated that he acted out of anger and had made a "poor choice." He further told the evaluator that he "felt terrible" about his crime; "I never wanted to take a man's life. I have to carry this around with me for

the rest of my life . . . I want to apologize. . . . He didn't deserve to die." In the evaluator's view, Twinn had taken responsibility for his actions: "He was able to discuss some of the environmental and personal factors that contributed to him committing the crime. He also expressed remorse for committing his offense." The evaluator also noted that Twinn has "demonstrated appropriate insight into the personality style and causation factors of the life of crime." The report concluded that Twinn presented a "low risk for violent recidivism."

The 2008 evaluation found that Twinn's plans for parole appeared feasible and that he could lower his risk for recidivism by continuing "to refine his plans for residence and employment in the community" prior to release from custody. The reports concluded that "*if*" Twinn remains in custody he may benefit from, among other things, "continuing to explore the circumstances of the crime."

Over the years Twinn has received consistent positive reports about his strong work ethic, positive and dependable attitude. His supervisors and trainers have described him as an excellent worker, who expressed a willingness to learn, possessed a sense of humor, had effective communication skills and was respectful. While in prison he has served as manager of the "tool crib." Twinn completed all of the vocational training and obtained the requisite certificates to work as a welder. He serves as the assistant to the welding instructor. His training as a welder qualifies him for postrelease acceptance into an ironworker's apprenticeship program which pays $17.75 an hour and includes benefits. Twinn's welding instructor indicated a belief that Twinn would be accepted into the program.

Twinn has no history of involvement with criminal activity or substance abuse while in prison. In May 1993, while he was housed at the California Youth Authority, Twinn received a 115 violation report alleging that he tampered with a urine sample. He received two rule 128A violations, the most recent in 2001 for speaking loudly during a vocational training course.[4]

D. *Prior Parole Suitability Proceedings.*

In 2000, at Twinn's first parole suitability hearing, the Board denied him parole for two years based on the commitment offense, his juvenile record and insufficient institutional programming. In 2003 and 2004, the Board denied him parole again.

---

[4] A 115 report documents misconduct believed to be a violation of the law that is not minor in nature, while a 128 report documents incidents of minor misconduct. (Cal. Code Regs., tit. 15, § 3312, subd. (a)(2); *In re Gray* (2007) 151 Cal.App.4th 379, 389 [59 Cal.Rptr.3d 724].)

In May 2006, the Board found Twinn suitable for parole for the first time. In September 2006 the Governor reversed the Board's decision based on the nature of the crime, Twinn's "too recent" acceptance of responsibility and the opposition of law enforcement.

In May 2007, the Board found Twinn unsuitable for parole, based on the grounds cited by the Governor in his 2006 reversal. Twinn filed a habeas corpus petition challenging the Board's 2007 decision in this court (*In re Twinn* (Nov. 23, 2010, B208105)).[5] He argued that the Board incorrectly applied the "some evidence" standard and that its decision was arbitrary and capricious. This court directed respondent to file an informal response to the petition.

### E. *2008 Suitability Proceedings, Habeas Corpus Petition and Appeal.*

On October 9, 2008, Twinn again appeared before the Board for another parole hearing. Although Twinn exercised his right not to discuss the circumstances of the commitment offense, he discussed his background, juvenile conduct, work and conduct in prison, and his participation in rehabilitation, self-help and development programs. The Board received into evidence letters of support and commendation from Twinn's supervisors in prison and family members. The Board considered Twinn's most recent psychological evaluation, finding Twinn to be a low risk of recidivism and danger if released. Twinn discussed his parole plans: he intended to live with his wife and daughter; he would continue to participate in NA/AA; and he had a job offer at a nonprofit agency Venice 2000 that works with young people struggling with "hardships and seeking assistance to transform their lives."[6] He stated that his long-term goal was to find work as a union welder. Twinn explained to the Board how he had developed methods to deal with stress and acting impulsively. He also noted that he has severed all gang ties he had as a young person. Twinn discussed how he had matured in prison and had learned to take responsibility for his crime and had engaged in prayer, meditation and sought forgiveness. He related that he had developed positive relationships with his family members. Twinn spoke of the debt he owed to society and his victim, about how he planned to volunteer to work with young people if he is released. The district attorney continued to state his opposition to Twinn's release.

The Board found Twinn suitable for parole. The Board stated its decision was based on its conclusion that notwithstanding the grave circumstances of

---

[5] Twinn's petition is pending in this court. In view of the subsequent proceedings in this matter, by separate order we will dismiss that petition as moot.

[6] Twinn's prospective employer verified the offer of employment. Twinn's 2008 psychological evaluation report reflected that the offer at Venice 2000 would pay Twinn $15.50 per hour to work as a counselor.

the commitment offense, and Twinn's juvenile record, the weight of positive factors supported a finding of suitability, including his positive programming in prison, his expression of "genuine remorse," his efforts to make amends and accept responsibility for his conduct, his commitment to work with young people, and his insight into his actions. The Board commended him for his institutional behavior and development, and pursuit of a career as a welder, and training as a carpenter and in office services. The panel noted that Twinn had a "stable social history" and that he had "stable relationships" with others, including family members.

On March 5, 2009, the Governor reversed the Board's 2008 parole decision. In reversing the Board's decision, the Governor relied on the nature of the commitment offense, which he described as "especially atrocious." The Governor also concluded that Twinn lacked "full insight" into his crime and appeared to have minimized his responsibility. In making this finding the Governor acknowledged that Twinn had taken responsibility for his crimes since 2002, but that prior to that time he had made statements indicating that he lacked insight. Specifically the Governor cited to statements in Twinn's 1995 psychological evaluation in which he claimed he was "innocent," and his 2000 evaluation in which he purportedly said that Golder's death was "accidental." The Governor concluded that, "[b]ased on the record, I do not believe Mr. Twinn has shown a sufficient pattern of consistent progress to assure me that he understands the circumstances surrounding the crime and his responsibility for the murder." Finally, the Governor cited Twinn's parole plans, which the Governor found to be lacking in sufficient detail, including lacking "the number of hours he can expect to work or the rate of pay he would receive." The Governor noted that given the fact that Twinn's 2008 mental evaluation had concluded that Twinn's success on parole would be determined, in part, on his securing employment, additional details to confirm his employment offer were needed to "confirm the viability" of his plans. The Governor concluded that three factors—the commitment offense, his inconsistent history of insight and responsibility, and the "lack of a viable means" of supporting himself demonstrated that Twinn posed an unreasonable risk to public safety if released on parole.

On May 1, 2009, Twinn filed the petition for a writ of habeas corpus in the superior court challenging the Governor's reversal of the Board's 2008 decision to grant him parole. Twinn argued that the Governor's reversal was not supported by some evidence of Twinn's current dangerousness. On November 25, 2009, the trial court issued an order granting the petition for a writ of habeas corpus. The superior court ordered that the Governor's decision must be vacated and the Board's grant of parole reinstated. The court found that given Twinn's conduct in prison, and his programming and rehabilitation, there was no rationale nexus between Twinn's commitment offense and current dangerousness to support a finding of suitability. Finally,

the court rejected the Governor's finding that Twinn did not have feasible plans for release, as required by law. The warden[7] of the Avenal State Prison filed a notice of appeal (*In re Twinn, supra*, B221051).[8]

### F. Current Proceedings.

On October 6, 2009, during the pendency of the habeas corpus proceedings in the superior court, the Board conducted another parole hearing for Twinn.

#### 1. The 2009 Board Hearing and Decision.

At the 2009 hearing before the Board, Twinn again testified concerning the circumstances of his upbringing and juvenile conduct. He reflected on his prison programming, education and training, and current family support. Although Twinn told the Board he would not discuss the circumstances of the crime, he did state his feelings of remorse about the crime and the victim. He told the Board that Golder did not deserve to die, that he thought about it every day, reflecting on the "stupid" choice he made to harm Golder. Twinn stated that he wanted to make sure Golder's death would not be in vain and that he was going to live his life in terms of the better value system he had subsequently developed in prison. Twinn also admitted that initially he had minimized what he had done because he believed that Golder would not have died absent his heart condition. Twinn stated that his understanding of his responsibility and involvement had changed: "It started some years ago. I can't even say it just started at just one point, but it was a gradual growth process and saying, you know, I really took this man's life. I was embarrassed for one, you know. I was ashamed. . . . [¶] Yeah, I'm still ashamed of it. It's something I'm never going to be able to say, okay, I feel comfortable with this." In referencing these comments a board commissioner stated that although Twinn had originally minimized his conduct and expressed some inconsistencies concerning the offense, that it also appeared based on the transcripts from the prior seven Board hearings, that over time Twinn had taken more and more responsibility for his actions to the point that he had taken full responsibility for his conduct.

Twinn also told the Board that he did not intend to kill Golder—that his intent that day was to injure Golder: "Unfortunately, I took his life, but I never went in there thinking that, you know. I'm going to go and I'm going to kill him for what he's done. Not once was that my thought process."

---

[7] Although the appeal concerns the action of the Governor, the appellant—and the respondent for the petition for writ of habeas corpus filed by Twinn—is the warden of the prison where the inmate is incarcerated. (Pen. Code, § 1477.)

[8] The appeal is pending in this court. In view of our conclusion here, by separate order we will dismiss the appeal in *In re Twinn, supra*, B221051 as moot.

Twinn presented evidence of his job offer from Venice 2000, including a letter from his employer in the program reflecting the offer of employment and rate of pay.[9] Twinn told the Board that he would work at the program as a counselor and though he did not have any specific training as a counselor he would draw upon his experiences as a life-term inmate to perform the work. He further described his potential job prospects as a welder in the apprenticeship program.

At the hearing the representative from the district attorney's office did not oppose granting Twinn parole. Instead, the district attorney's representative stated that it would "submit" based on the Board's recommendation.

At the conclusion of the hearing, the Board announced its decision to grant Twinn's request. In announcing its decision, the Board specifically addressed the reasons the Governor cited in his 2009 reversal of the Board's decision. As to the Governor's conclusion Twinn lacked "insight" into his crime, the Board found that Twinn had offered context and a rational explanation for each of the facts that the Governor had previously relied on. The Board also concluded that Twinn had realistic and viable postparole job prospects.

2. *Governor's 2010 Reversal.*

Thereafter, on March 2, 2010, the Governor reversed the Board's 2009 decision to grant Twinn parole. As the Governor did before in reversing the Board's 2008 grant of parole, the Governor cited as a basis for his reversal the nature of the commitment offense. The Governor also relied upon Twinn's purported lack of insight into his offense, and his failure to accept responsibility for his violent behavior, citing statements Twinn made to mental health evaluators in 1991, 1995 and 2000 in which Twinn stated that Golder's death was "accidental" and that he did not intend to kill the victim. The Governor emphasized that as recently as the 2009 Board hearing, Twinn continued to maintain that he did not intend to kill Golder. The Governor also relied upon statements that Twinn made to the Board in 2005 when he denied that he used a stick or shopping cart in the beating. Finally, the Governor relied upon the fact that in 2005, Twinn told an evaluator that he kicked the victim once, but told the Board in 2007 that he kicked the victim twice or more. As for current dangerousness and lack of insight the Governor found that: "Twinn's efforts to alternatively claim non-involvement and characterize his actions as unintentional constitute a refusal to accept responsibility for the life offense. My concern is further supported by his 2008 mental-health evaluator's conclusion that Twinn would benefit from 'continuing to explore the circumstances of the crime.' Twinn's ongoing lack of insight renders the life offense

---

[9] According to the transcript from the 2009 Board hearing, the letter from his prospective employer noted that Twinn would work "five days a week and earn $15.50 an hour."

still relevant to my determination that he continues to pose a current, unreasonable risk to public safety because Twinn cannot ensure that he will not commit similar crimes in the future if he does not completely understand and accept full responsibility for his offense."

Finally, as the Governor had in the prior reversal in 2009, in the 2010 reversal, the Governor again found that Twinn did not have suitable parole plans because he lacked a "verified job offer." The Governor bolstered his conclusion in this regard by noting that although Twinn stated he intended to counsel young people in his work at Venice 2000, that Twinn did not have any training as a counselor.

### 3. Habeas Corpus Proceedings.

In July 2010, Twinn filed the instant petition for a writ of habeas corpus in this court challenging the Governor's reversal of the Board's 2009 decision to grant him parole.

## DISCUSSION

Before this court Twinn contends the Governor erroneously reversed the Board's 2009 decision to grant him parole. Twinn claims the Governor's finding that he was not suitable for parole was not supported by "some evidence" in the record, including a finding that Twinn lacked insight into the offense and had not accepted responsibility for his criminal actions, and that his parole plans were not sufficient to ensure his long-term success if released into the community. We begin our analysis discussing the governing legal principles, and then turn our attention to the Governor's decision.

### A. Legal Framework Governing Parole Suitability Assessments.

■ "The granting of parole is an essential part of our criminal justice system and is intended to assist those convicted of crime to integrate into society as constructive individuals as soon as possible and alleviate the cost of maintaining them in custodial facilities. [Citations.] Release on parole is said to be the rule, rather than the exception [citations] and the Board is required to set a release date unless it determines that 'the gravity of the current convicted offense . . . is such that consideration of the public safety requires a more lengthy period of incarceration . . . .' [Citation.]" (*In re Vasquez* (2009) 170 Cal.App.4th 370, 379–380 [87 Cal.Rptr.3d 853] (*Vasquez*).)

■ The decision whether to grant parole is a subjective determination, guided by a number of factors, some objective, identified in Penal Code

section 3041 and the Board's regulations. (Cal. Code Regs., tit. 15, §§ 2281, 2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 660–661, 655 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).) The Governor's decision to affirm, modify, or reverse the decision of the Board rests on the same factors that guide the Board's decision (Cal Const., art. V, § 8, subd. (b)), and is based on "materials provided by the parole authority" (Pen. Code, § 3041.2, subd. (a)). "Although these provisions contemplate that the Governor will undertake an independent, de novo review of the prisoner's suitability for parole, the Governor's review is limited to the same considerations that inform the Board's decision." (*Rosenkrantz, supra,* 29 Cal.4th at pp. 660–661.)

■ In making the suitability determination, the Board and the Governor must consider "[a]ll relevant, reliable information" (Cal. Code Regs., tit. 15, § 2402, subd. (b); hereafter section 2402), such as the nature of the commitment offense including behavior before, during, and after the crime; the prisoner's social history; mental state; criminal record; attitude towards the crime; and parole plans (§ 2402, subd. (b)). The circumstances that tend to show unsuitability for parole include that the inmate: (1) committed the offense in a particularly heinous, atrocious, or cruel manner;[10] (2) possesses a previous record of violence; (3) has an unstable social history; (4) has previously sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (§ 2402, subd. (c).) A factor that alone might not establish unsuitability for parole may still contribute to a finding of unsuitability. (§ 2402, subd. (b).)

■ Circumstances tending to show *suitability* for parole include that the inmate (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress had built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (§ 2402, subd. (d).)

---

[10] Factors that support the finding the crime was committed "in an especially heinous, atrocious or cruel manner" (§ 2402, subd. (c)(1)), include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense.

■ These criteria are "general guidelines," illustrative rather than exclusive, and " 'the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the [Board or Governor].' " (*Rosenkrantz, supra*, 29 Cal.4th at p. 654; see § 2402, subds. (c), (d).) Thus, the endeavor is to try "to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (*Rosenkrantz, supra*, 29 Cal.4th at p. 655.) Such a prediction requires analysis of individualized factors on a case-by-case basis. While parole unsuitability factors need only be found by a preponderance of the evidence, the Governor's decision, like the Board's decision, must comport with due process. (*Id.* at pp. 660, 679.)

## B. *Judicial Review.*

In *Rosenkrantz*, the California Supreme Court addressed the standard for a court to apply when reviewing a parole decision by the executive branch. The court held that "the judicial branch is authorized to review the factual basis of a decision of the Board denying parole . . . to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz, supra*, 29 Cal.4th at p. 658.)

In conducting this independent review of the Governor's decision, "[i]t is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.) "[T]he court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's [or Board's] decision." (*Ibid.*)

In *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*), the Supreme Court reaffirmed its analysis in *Rosenkrantz, supra*, 29 Cal.4th 616, that the decision of parole suitability is subject to the "some evidence" standard of review. (*Lawrence, supra*, 44 Cal.4th at p. 1205.) However, in doing so it recognized that *Rosenkrantz's* characterization of that standard as extremely deferential and requiring "[o]nly a modicum of evidence" (*Rosenkrantz, supra*, 29 Cal.4th at p. 677) had generated confusion and disagreement among the lower courts "regarding the precise contours of the 'some evidence' standard." (*Lawrence, supra*, 44 Cal.4th at p. 1206.) The court in *Lawrence* recognizes that the legislative scheme contemplates "an assessment of an inmate's current dangerousness." (*Id.* at p. 1205, italics omitted.) "[I]n light of the constitutional liberty interest at stake, judicial review must be sufficiently robust to reveal and remedy any

evident deprivation of constitutional rights. If simply pointing to the existence of an unsuitability factor and then acknowledging the existence of suitability factors were sufficient to establish that a parole decision was not arbitrary, and that it was supported by 'some evidence,' a reviewing court would be forced to affirm any denial-of-parole decision linked to the mere existence of certain facts in the record, even if those facts have no bearing on the paramount statutory inquiry. Such a standard, because it would leave potentially arbitrary decisions of the Board or the Governor intact, would be incompatible with our recognition that an inmate's right to due process 'cannot exist in any practical sense without a remedy against its abrogation.' " (*Id.* at p. 1211, quoting *Rosenkrantz, supra,* 29 Cal.4th at p. 664.) Accordingly the court in *Lawrence* clarified that the analysis required when reviewing a decision relating to a prisoner's current suitability for parole is "whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Lawrence, supra,* 44 Cal.4th at p. 1212.)

"It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Lawrence, supra,* 44 Cal.4th at p. 1212.) Indeed not only must there be some evidence to support the Board's factual findings there must be some connection between the findings and the conclusion that the inmate is currently dangerous. As to this standard, the court in *Lawrence* further explained that although it was "unquestionably deferential, [it was] certainly . . . not toothless, and 'due consideration' of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*Lawrence, supra,* 44 Cal.4th at p. 1210.) In other words, the exceedingly deferential nature of the "some evidence" standard does not convert a reviewing court " 'into a potted plant.' " (*Lawrence, supra,* 44 Cal.4th at pp. 1211–1212, quoting *In re Scott* (2004) 119 Cal.App.4th 871, 898 [15 Cal.Rptr.3d 32] (*Scott I*).) We must ensure that the denial of parole is based on "some evidence" of current dangerousness. "[S]uch evidence ' "must have some indicia of reliability." ' (*Scott I, supra,* 119 Cal.App.4th at p. 899.) "[T]he 'some evidence' test may be understood as meaning that suitability determinations must have some rational basis in fact." (*In re Scott* (2005) 133 Cal.App.4th 573, 590, fn. 6 [34 Cal.Rptr.3d 905] (*Scott II*).)

Because consideration of public safety is the primary statutory issue to be determined in deciding whether an inmate should be granted parole (Pen. Code, § 3041, subd. (b); *Lawrence, supra,* 44 Cal.4th at p. 1205), "[t]his inquiry is, by necessity and by statutory mandate, an individualized one . . . ,"

and requires a court to consider the circumstances surrounding the commitment offense, along with the other facts in the record, to determine whether an inmate poses a current danger to public safety. (*In re Shaputis* (2008) 44 Cal.4th 1241, 1254–1255 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*).) "Relevance to the issue of the inmate's current risk to public safety is the key." (*In re Criscione* (2009) 180 Cal.App.4th 1446, 1457 [103 Cal.Rptr.3d 549], citing *Lawrence, supra*, 44 Cal.4th at p. 1219.)

Regarding such consideration, "although the Board and Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1214.)

### C. *Analysis of the Governor's Reversal.*

The Governor expressed three concerns in reversing the Board's 2009 decision to release Twinn from prison: (1) the nature of the commitment offense, which the Governor described as "especially atrocious because [Twinn] and his crime partner beat an unarmed, vulnerable homeless man to death"; (2) Twinn "may lack a viable means to support himself if he is released" because he "does not have viable job offer"; and (3) Twinn has "still failed to obtain insight into the life offense or accept full responsibility for his violent behavior." We examine the factors mentioned by the Governor.

#### 1. *Viable Means of Support upon Release from Prison.*

In reversing the Board's grant of parole, the Governor was "troubled" by the fact that Twinn's parole plans did not appear to be sufficient. Specifically, the Governor found that there was no evidence before the Board that Twinn had a "confirmed" or "verified" job offer.

██ In considering parole plans, section 2402, subdivision (d)(8) indicates that the Board (or in this case the Governor) should consider whether "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." "Thus, based on its clear language, the regulation's requirement that an inmate have parole plans is limited to requiring realistic plans. The entire thrust of the regulation is on practicality." (*In re Andrade* (2006) 141 Cal.App.4th 807, 816–817 [46 Cal.Rptr.3d 317].)

Based on the record before the Governor in 2010, and the regulations that govern parole and release plans, we conclude there is not some evidence to support the Governor's factual finding that Twinn lacked sufficient parole plans or means to support himself upon release. The evidence before the Board in 2009 showed that Twinn had a job offer from Venice 2000, including a letter from his employer in the program reflecting the offer and rate of pay of $15.50 per hour. Twinn told the Board that he would work at the program as a counselor and that he would draw upon his experiences as a life-term inmate to perform the work. He further described his potential job prospects as a welder in the apprenticeship program, including a letter confirming that upon his release he would be eligible to be accepted in the Ironworkers' program. In view of this evidence, the Governor's finding lacks a basis in the record and does not support the conclusion that Twinn is unsuitable for parole or constitutes a current threat to public safety.

### 2. *Twinn's Insight and Responsibility.*

An inmate's acceptance of responsibility and signs of remorse may be considered in determining the inmate's suitability for parole. (§ 2402, subd. (d)(3); *Shaputis, supra*, 44 Cal.4th at p. 1246.)[11] In addition, to the extent these factors show an inmate lacks insight into and understanding of the behavior precipitating the commitment offense, they can support a conclusion the inmate is currently dangerous. (*Shaputis, supra*, 44 Cal.4th at p. 1260.) Expressions of insight and remorse will vary from inmate to inmate and there are no special words for an inmate to articulate in order to communicate he or she has committed to ending a previous pattern of violent or antisocial behavior. (*Id.* at p. 1260, fn. 18.) Like all evidence relied upon to find an inmate unsuitable for release on parole, in our view "lack of insight" is probative of unsuitability only to the extent that it is shown by the record and rationally indicative of the inmate's current dangerousness.

Here in his 2010 reversal of the Board, the Governor found that Twinn has "still failed to obtain insight into the offense or accept full responsibility for his violent behavior." The Governor cited as supportive of these findings evidence that Twinn (a) had made inconsistent statements about how the crime occurred and statements inconsistent with the evidence presented at

---

[11] An inmate cannot, however, be required to discuss the circumstances of the commitment offense or to admit guilt in order to be found suitable for parole. (Pen. Code, § 5011; Cal. Code Regs., tit. 15, § 2236.) Nonetheless, if an inmate chooses to discuss the circumstances of the commitment offense, or the inmate's responsibility and remorse for an offense, the Board and Governor may consider the inmate's remarks to the extent the remarks are relevant to the inmate's parole suitability. (§ 2402, subd. (b) ["All relevant, reliable information available to the panel shall be considered in determining suitability for parole."].)

trial; (b) denied that he intended to kill Golder; and (c) had minimized his involvement in the crime and refused to accept total responsibility for his actions.

### (a) *Inconsistencies in Twinn's Explanation and Inconsistencies with the Official Version of the Crime.*

In reversing the Board's decision to grant Twinn parole, the Governor concluded that Twinn lacked insight and had minimized his actions because his description of the crime did not correspond with other physical evidence of the crime and that he had changed his explanation of the attack. The Governor cited the facts that Twinn told the Board in 2006 that he did not use a stick or a shopping cart during the attack notwithstanding evidence presented at the trial that a stick and shopping cart were used in the attack. In addition, the Governor cites evidence that although Twinn told the mental health evaluator in 2005 that he only kicked Golder once, in 2007 he told the Board that he kicked Golder twice and possibly more. Our review thus begins with the issue of whether there is "some evidence" to support the Governor's factual finding that Twinn continues to change his explanation of the crime and that Twinn's version differs from the evidence presented during the trial.

■ The Governor, like the Board, "is precluded from conditioning a· prisoner's parole on an admission of guilt. (Pen. Code, § 5011, subd. (b); Cal. Code Regs, tit. 15, § 2236.)" (*In re Palermo* (2009) 171 Cal.App.4th 1096, 1110 [90 Cal.Rptr.3d 101] (*Palermo*).) Furthermore, an inmate need not agree or adopt the official version of a crime in order to demonstrate insight and remorse. (*Ibid.*) *Palermo* is instructive. There, the Third District Court of Appeal granted relief to a habeas corpus petitioner who challenged the Board's denial of parole. The Board's denial was based in part on the inmate's continued insistence that he had accidentally shot his girlfriend with his gun, which was at odds with the inference from the evidence presented by the prosecutor at trial. (*Id.* at pp. 1110–1111.) The appellate court concluded that "defendant's version of the shooting of the victim was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational. And . . . defendant accepted 'full responsibility' for his crime and expressed complete remorse; he participated effectively in rehabilitative programs while in prison; and the psychologists who evaluated him opined that he did not represent a risk of danger to the public if released on parole. Under these circumstances, his continuing insistence that the killing was the unintentional result of his foolish conduct (a claim which is not necessarily inconsistent with the evidence) does not support the Board's finding that he remains a danger to public safety." (*Id.* at p. 1112, italics omitted.)

Similar to the facts in *Palermo*, Twinn's version of the crime was not physically impossible and did not strain credulity such that his explanation was delusional, dishonest, or irrational.

Turning to the stick and shopping cart evidence, according to the evidence in the record, as reflected in our 1995 opinion affirming Twinn's conviction, there was evidence that Golder had injuries consistent with being struck by a piece of wood and that "*one of the appellants* picked up a shopping cart and threw it on the victim." However, evidence was also presented during the trial that on the afternoon of Golder's death he got into a fight with another person who struck Golder repeatedly with a two-by-four piece of wood. Furthermore the jury rejected a specific allegation that Twinn used a "stick" as a deadly weapon. At the 2006 parole hearing, Twinn told the Board that *he* did not use the shopping cart and that Yates carried a stick that day. In view of this evidence, we conclude that because Twinn's denials concerning the use of the stick and shopping cart are not incompatible with the evidence presented at trial, those statements do not support the Governor's finding on lack of insight.

Furthermore, Twinn has accepted "full responsibility" for his crime and expressed complete remorse; participated effectively in rehabilitative programs while in prison; and the psychologists who evaluated him have opined that he represented a low risk of danger to the public if released on parole. Under these circumstances, his continuing insistence that he did not use a stick or shopping cart does not support the Governor's finding that he remains a danger to public safety. (*Palermo, supra*, 171 Cal.App.4th at p. 1112.) In light of *Palermo*, Twinn's failure to accept a version of the facts is not evidence in and of itself that Twinn continues to pose a danger to public safety.

■ Likewise, of limited probative value are Twinn's statements about the number of times he kicked Golder. While it is certainly true that Twinn has added details—increased the number of times he kicked the victim—his story otherwise has remained consistent over the years. In fact, his statements about kicking the victim show that he has increasingly taken more responsibility for his actions. Furthermore, at every Board hearing since 2007 Twinn testified at length concerning his feelings of remorse and responsibility. The Board has accepted Twinn's statements as a genuine reflection of regret and responsibility. "[A]cceptance of responsibility works in favor of release '[n]o matter how longstanding or recent it is,' so long as the inmate 'genuinely accepts responsibility . . . .' " (*In re Elkins* (2006) 144 Cal.App.4th 475, 495 [50 Cal.Rptr.3d 503].)

Consequently, we conclude there is not "some evidence" that Twinn lacks insight into his crimes based on these purported inconsistencies in Twinn's explanation and the alleged inconsistencies between his version of events and those presented at trial.

■ In any event, the Governor does not articulate a rational nexus between these discrepancies and present dangerousness, and we fail to see such a connection, particularly in light of Twinn taking responsibility for the commitment offense and his exemplary prison record. (See *In re Moses* (2010) 182 Cal.App.4th 1279 [106 Cal.Rptr.3d 608] [minor discrepancies in an inmate's version of a crime do not standing alone demonstrate a rational nexus to current dangerousness].)

(b) *Twinn's Denial of an Intent to Kill Golder.*

Similarly we do not agree with the Governor's claim that Twinn's denial of an intent to murder Golder is "some evidence" to support a finding that he lacks insight and has failed to accept responsibility for his crimes.

To be sure, Twinn has always denied that he intended to kill Golder. He told mental health evaluators in 1991, 1995 and 2000 that Golder's death was "accidental" and that he did not intend to kill the victim. As Twinn told the Board in 2009, his intent that day was to injure Golder: "Unfortunately, I took his life, but I never went in there thinking that, you know. I'm going to go and I'm going to kill him for what he's done. Not once was that my thought process."

The physical evidence presented at trial does not undermine Twinn's statements concerning his intent. During the trial, the medical examiner testified that the *immediate* cause of Golder's death was arteriosclerotic disease of the heart (i.e., obstructed arteries), and that the blunt force injuries from the beating contributed to his death. Indeed the District Attorney told the Board in 2003 that "Although [Twinn] did participate in beating the victim, it does not appear that he intended to kill the victim and but for the victim's preexisting anterior sclerosis probably brought on by his lifestyle, this inmate would not be here today." In view of the foregoing, we conclude there is not "some evidence" that Twinn lacks insight based on his statements concerning his intent that day.

(c) *Twinn's Denial of Involvement in the Crime and Minimizing His Responsibility.*

In concluding that Twinn lacks insight and has failed to take responsibility for his crimes the Governor also points to evidence that Twinn had denied

any involvement in Golder's death until 2000 and that in 2000 he told the mental health evaluator that he was "offered six years since the death was accidental."

The evidence in the record demonstrates Twinn has offered context for his initial denials of responsibility. Twinn explained to the Board his statements in the 1990's about his involvement in the crime reflected advice of legal counsel who told him to maintain his innocence while his appeal was pending. Twinn also told the Board that he never met with the counselor who in 2000 wrote that Twinn had "continuously denied" involvement in the beating, and that in 2000 he had refused to "sign on" to that statement because he did not agree with it. At the hearing in 2009, the Board found that Twinn's explanations when placed in their proper context did not show he was unsuitable for parole.

Nonetheless, Twinn also conceded to the Board during the 2009 hearing that in the past he had minimized what he had done because he believed that Golder would not have died absent his heart condition. Twinn stated that his understanding of his responsibility and involvement had changed: "It started some years ago. I can't even say it just started at just one point, but it was a gradual growth process and saying, you know, I really took this man's life. I was embarrassed for one, you know. I was ashamed. . . . [¶] Yeah, I'm still ashamed of it. It's something I'm never going to be able to say, okay, I feel comfortable with this." In referencing these comments, a Board commissioner also noted that Twinn had originally minimized his conduct and expressed some inconsistencies concerning the offense.

In light of Twinn's concessions and the Board commissioner's observations, there would appear to be, therefore, "some evidence" in the record to support the Governor's factual finding that in the past Twinn minimized his involvement in Golder's death. The question remains however, whether Twinn's prior minimization and denials are rationally indicative of current dangerousness. On the one hand, Twinn has fully accepted all responsibility for his crime. (*Vasquez, supra*, 170 Cal.App.4th at pp. 385–386 [Governor could not ignore fact that inmate no longer claimed self-defense at the hearings though had mentioned it in earlier evaluations; later evaluations showed inmate much improved, Governor only relied on early ones]; *Lawrence, supra*, 44 Cal.4th at p. 1224 [reliance upon outdated psychological reports clearly contradicted by petitioner's successful participation in years of intensive therapy, a long series of reports declaring petitioner to be free of psychological problems and no longer a threat to public safety, and petitioner's own insight into her participation in this crime does not supply some evidence justifying the Governor's conclusion that petitioner continues to pose a threat to public safety].) Nonetheless, Twinn's admission that he had

initially minimized his involvement in the crime is recent—his statements on the subject at the 2009 hearing do establish an exact timeline or trajectory of this revelation. Thus, on this close issue, in conducting our deferential review of the Governor's decision to reverse the Board's grant of parole, we cannot say the Governor's finding on "lack of insight" was arbitrary and capricious. (*Lawrence, supra,* 44 Cal.4th at p. 1226 ["[o]ur deferential standard of review requires us to credit the Governor's findings if they are supported by a modicum of evidence"].) Nonetheless, this conclusion does not end our analysis; we must now turn to whether such evidence is probative to the issue of current dangerousness. (See *Lawrence, supra,* 44 Cal.4th at p. 1221; accord, *In re Shaputis, supra,* 44 Cal.4th at p. 1255.)

### 3. *The Commitment Offense.*

We agree with the Governor that the circumstances of the commitment offense were "especially atrocious." Twinn's conduct showed a callous and cruel disregard for Golder's life. The commitment offense fully justified Twinn's conviction and sentence for second degree murder. However, even though there is some evidence to support the finding that Twinn's second degree murder was committed in a cruel and callous manner (§ 2402, subd. (c)(1)(E)), such reason would only provide "some evidence" to support the ultimate conclusion and denial of parole here if there were other facts in the record, such as the inmate's history before and after the offense or the inmate's current demeanor and mental state, to provide a "rational nexus" for concluding Twinn's offense continues to be predictive of current dangerousness. (*Lawrence, supra,* 44 Cal.4th at pp. 1210, 1213, 1221.) As the court in *Lawrence* stated, "the mere existence of a regulatory factor establishing unsuitability does not necessarily constitute 'some evidence' that the parolee's release unreasonably endangers public safety. [Citation.]" (*Id.* at p. 1225.)

The factors cited by the Governor as providing the "rational nexus" between the commitment offense and Twinn's current risk of dangerousness are his "lack of insight" into the circumstances of the offense and his failure to accept "total" responsibility for his role in the crime, and that Twinn may lack a viable means to support himself.

It is certainly possible that the commitment offense, insufficient insight into the offense, the failure to accept full responsibility for one's actions and a lack of viable parole plans considered together provide a "rational nexus" for concluding that the commitment offense continues to be predictive of current dangerousness. However, as we have discussed elsewhere here, the Governor's contention that Twinn lacks a viable means to support himself after he is released from prison is unreasonable based on the record that was

before the Governor. Furthermore, although there is some evidence to support the Governor's finding that Twinn minimized his role in the crime, this factor, along with the commitment offense must be viewed in the context of the prisoner's entire record. "[T]he relevant inquiry for a reviewing court is . . . whether the identified facts are probative to the central issue of current dangerousness when considered in light of the full record before the Board or the Governor." (*Lawrence, supra,* 44 Cal.4th at p. 1221, italics omitted; accord, *Shaputis, supra,* 44 Cal.4th at p. 1255.)

On this record, as indicated elsewhere, there is a modicum of evidence that Twinn has lacked full insight; at least in the past—he admitted as much to the Board during the 2009 hearing when he conceded that he had minimized his involvement and responsibility for Golder's death. Nonetheless, when we consider how that factor interrelates to the other factors indicating parole suitability, there is no "rational nexus" between Twinn's present assessment of the nature of his role in the murder and any current threat to public safety. (See *Lawrence, supra,* 44 Cal.4th at pp. 1221, 1227.) But for the immutable nature of his life of crime, and the modicum of evidence that he initially did not have insight into the commission of the crime or accept responsibility for it, all the applicable regulatory criteria indicate that Twinn is suitable for parole. (§ 2402, subd. (d).)

Twinn has been a model prisoner; he has addressed anger and immaturity issues that led to his life of crime as a teenager via formal self-help, vocational and educational programs, therapy and 12-step programs. Twinn had a minor criminal record as a juvenile and has remained discipline free in prison for nine years. He has no history of mental illness or disorders indicating that he poses a threat, and various psychological and psychiatric evaluators unanimously have concluded that he is a very good candidate for parole and would unlikely reoffend if released. The latest psychological evaluator concurred in this assessment, finding Twinn to be a low risk for violence and recidivism if released. The Board found Twinn credible, remorseful and that he had insight into his crime for which he accepted full responsibility. Twinn has repeatedly expressed his remorse to the Board and made efforts to reach out to apologize to Golder's family. Twinn further has marketable skills, a supportive community outside of prison and realistic parole plans, including a current job offer as a counselor, and additional plans to work as an apprentice welder.

Thus, based on the record before us, the commitment offense, notwithstanding its nature, has not been shown to be relevant to the ultimate determination of Twinn's current dangerousness. The Governor has failed to make the requisite connection between his findings and the conclusion that Twinn is currently dangerous. Although the Governor's reversal cited a

recommendation in the 2008 psychological evaluation that Twinn should "continue to explore the circumstances of his crime" as proof of the connection between his findings and current dangerousness, the evaluator's comments are taken entirely out of context. The evaluator's suggestion was conditioned on Twinn remaining in custody; it was listed among other suggestions that Twinn could focus on *if* he *was not* released on parole. The statement was not offered as a reason for Twinn to remain incarcerated or to show that Twinn posed a current danger. Under scrutiny, this evidence simply does not support the Governor's decision.

■ Accordingly there is not "some evidence" from the 2009 parole suitability record to support the Governor's 2010 reversal of the Board's determination that Twinn did not pose unreasonable risk of danger to society if released on parole. Thus, we conclude, under the standards adopted by *Lawrence, supra*, 44 Cal.4th 1181, and the application of those standards in this case, the Governor's decision violated Twinn's due process rights. Because the Governor's finding of suitability has no evidentiary support, it cannot stand. Accordingly, he is entitled to habeas corpus relief.

### D. *Remedy*

Because we conclude that the Governor erred in reversing the Board's 2009 decision to grant Twinn parole, we now turn our attention to the issue of the remedy for the error.

Recently in *In re McDonald* (2010) 189 Cal.App.4th 1008 [118 Cal.Rptr.3d 145] (*McDonald*), we addressed the appropriate remedy in the situation where the Governor erred in reversing the decision of the Board to release the inmate on parole. In *McDonald*, as here, the People argued that the reversal of the Governor's conclusion required remand for further consideration by the Governor under *In re Prather* (2010) 50 Cal.4th 238 [112 Cal.Rptr.3d 291, 234 P.3d 541] (*Prather*). We disagreed, noting first that *Prather* addressed a reversal of the Board's denial of parole, not as in *McDonald* (and here) the reversal of a Governor's decision. We further observed that: "The limitation that had been imposed on the Board's review in *Prather*, and in earlier cases, infringed the authority of the executive branch to make the necessary parole determinations; the court held this was a violation of the separation of powers established by the Constitution (Cal. Const., art. III, § 3). (*Prather, supra*, 50 Cal.4th at p. 253.) Here, in contrast, we reinstate an earlier executive branch decision—made by the Board—overturning only the 'veto' of that decision by the Governor. (See *id.* at p. 251.) The power of the executive branch is, in this instance, not infringed, but respected. [¶] Unlike the Board, which has the obligation and ability to take evidence, consistent with due process protections, the Governor cannot create an evidentiary record. A return to the

Governor for reconsideration would therefore mean that the Governor could look again only at the record before him on initial consideration, the same record this court has reviewed. We have reviewed that record, and neither the Governor, nor the Board, has the authority to ' "disregard a judicial determination regarding the sufficiency of the evidence [of current dangerousness] and to simply repeat the same decision on the same record." ' (*Prather, supra,* 50 Cal.4th at p. 258, quoting *In re Masoner* (2009) 172 Cal.App.4th 1098, 1110 [91 Cal.Rptr.3d 689].)" (*McDonald, supra,* 189 Cal.App.4th at p. 1024.)

We further rejected the People's argument that the Governor should be permitted to review the *same* record to determine if there are other facts that demonstrate current dangerousness because "[t]he Constitution provides for a single review by the Governor of a determination by the Board, and does not authorize repeated reviews of that single determination." (*McDonald, supra,* 189 Cal.App.4th at p. 1024.) We concluded that due process and a prisoner's right to a fair hearing required that "the Governor should state all of the reasons for his determination in the first instance, permitting prompt review, compliance with Constitutional mandates, and a predictable process" and therefore "[r]emand to the Governor after his determination is found lacking in some evidence of current dangerousness is inconsistent with this requirement and is not required by *Prather*." (*Id.* at p. 1025.)

We recognize our decision in *McDonald* is not yet final, nonetheless, its analysis on the issue of remedy applies equally to this case. We conclude, in balancing the inmate's right to due process against the authority of the executive branch to make the necessary parole determinations, there are circumstances, like here, in which remand is not the proper remedy—where such remand would result in constitutionally impermissible opportunities to " 'simply repeat the same decision on the same record.' " (*Prather, supra,* 50 Cal.4th at p. 258.)

In *McDonald*, however, we also noted in footnote 4 of the opinion that "because McDonald has been released on parole, we need not reach the issue of the proper mechanism to permit the Board to consider additional evidence indicating a threat to public safety prior to release where a Governor's reversal is overturned, but the inmate has not yet been paroled." (*McDonald, supra,* 189 Cal.App.4th at p. 1025, fn. 4.) Here Twinn remains in custody and thus, we now address the issue raised but left unresolved in footnote four in the *McDonald* opinion.

We do acknowledge the theoretical possibility—however unlikely it may be—that Twinn has engaged in conduct since his October 2009 parole hearing that would suggest he is no longer suitable for parole. Accordingly, we do not simply order him released forthwith, as we did with Sandra

Lawrence after granting her petition for writ of habeas corpus following the Governor's reversal of the Board's suitability determination. Rather, we direct the Board to proceed in accordance with its usual procedures for release of an inmate on parole unless within 30 days of the finality of this decision the Board determines in good faith that cause for rescission of parole may exist and initiates appropriate proceedings to determine that question. (See *In re Powell* (1988) 45 Cal.3d 894, 904 [248 Cal.Rptr. 431, 755 P.2d 881]; *In re Johnson* (1995) 35 Cal.App.4th 160, 169 [41 Cal.Rptr.2d 449]; *In re Caswell* (2001) 92 Cal.App.4th 1017, 1029 [112 Cal.Rptr.2d 462].)

### *DISPOSITION*

The petition for writ of habeas corpus is granted. The Governor's March 2, 2010 decision to reverse the Board's 2009 order granting Twinn's parole is vacated and the Board is ordered to conduct further proceedings in accord with the views expressed in this opinion.

Perluss, P. J., and Zelon, J., concurred.