Filed 7/12/21  P. v. Alvarez CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B305462 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA056865) |
| v. | |
| BROOK MICHAEL ALVAREZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan

Pithey, Senior Assistant Attorney General, Noah P. Hill and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

---

## INTRODUCTION

In 2000, appellant Brook Michael Alvarez (AKA Brook Michael Blankenship) was convicted of unlawful driving and evading the police with willful disregard for the safety of persons or property.  Because he had suffered two prior strike convictions under the Three Strikes law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), appellant received a third-strike sentence:  two concurrent terms of 25 years to life in prison.[1]  In 2012, appellant filed a petition for resentencing under section 1170.126, which had recently been enacted by Proposition 36, the Three Strikes Reform Act of 2012.  He contended his commitment offenses were not violent or serious, and thus that he should be resentenced as a second-strike offender.

Following an order to show cause and an evidentiary hearing, the superior court denied appellant's petition. While it was undisputed that appellant was eligible for resentencing under section 1170.126, the court concluded that based on his criminal history, disciplinary record, and inadequate release plans, appellant's resentencing would

---

[1]     Undesignated statutory references are to the Penal Code.

2

pose an unreasonable risk of danger to public safety.[2]  On appeal, appellant contends the trial court's conclusion constituted an abuse of discretion.  Finding no such abuse, we affirm.

## BACKGROUND

### A. *The Commitment Offenses and Appellant's Petition*

In 1999, a police officer spotted appellant driving a stolen car.  When the officer activated his lights and sirens, appellant accelerated and attempted to flee, exceeding 70 miles per hour in a 25-miles-per-hour residential area.  Appellant later slowed down and attempted to jump out of the car while it was still in motion, but the car hit a curb, throwing appellant out of the vehicle.  Appellant attempted to flee on foot but was apprehended.

The following year, appellant was convicted of unlawful driving of a vehicle (Veh. Code, § 10851, subd. (a)) and evading the police with willful disregard for the safety of persons or property (*id.*, § 2800.2).  Having suffered two prior strike convictions under the Three Strikes law, appellant was sentenced as a third-strike offender to two concurrent terms of 25 years to life in state prison.

---

[2]    As discussed below, the superior court may deny a petition under section 1170.126 if it determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety.  (§ 1170.126, subd. (f).)

In 2012, appellant filed a petition under newly enacted section 1170.126, seeking recall of his sentence and resentencing as a second-strike offender, and the superior court issued an order to show cause. The prosecution filed an opposition to the petition, conceding that appellant was eligible for relief under the statute, but asserting he was unsuitable for relief because his resentencing would pose an unreasonable risk of danger to public safety. The matter proceeded to an evidentiary hearing on appellant's suitability for resentencing in August 2019.

## B. *The Suitability Hearing*
### 1. *The Prosecution's Evidence*

At the suitability hearing, the prosecution called no witnesses but submitted numerous exhibits detailing, among other things, appellant's criminal history and his disciplinary record in prison.

#### a. *Appellant's Prior Convictions*

Appellant's criminal history was extensive and began at a young age. In 1985, when he was 16 years old, appellant suffered a sustained juvenile petition for grand theft. In 1987, as an adult, appellant was convicted of trespassing and two counts of battery. In 1990, he was convicted of burglary and evading a peace officer with willful disregard for the safety of persons or property. Appellant suffered another burglary conviction in 1991 (though he committed the offense in 1989). In 1992, he was convicted of

4

driving under the influence and two counts of assault with a deadly weapon. In 1994, he was convicted of resisting arrest. And in 1997, appellant was convicted of inflicting corporal injury on a spouse, with a great bodily injury finding. Appellant's record also showed he violated probation or parole in 1989, 1992, 1993, and 1994.

### b. *Appellant's Disciplinary Record in Prison*

In prison, appellant was associated with the Nazi Low Riders prison gang. California Department of Corrections and Rehabilitation (CDCR) records indicated he was an active associate at the time of the suitability hearing. During his current incarceration, appellant committed numerous disciplinary violations.

In 2001, appellant participated in a racial riot, during which he engaged in mutual combat with Black inmates. In 2003, he was found guilty of possession of a deadly weapon after correctional officers found a razor blade hidden in his cellmate's locker. That same year, he sustained a violation for willfully resisting, delaying, or obstructing a peace officer. In 2004, officers intercepted a letter addressed to appellant, containing a greeting card soaked in methamphetamine. Also in 2004, appellant was found guilty of fermentation or distillation of materials consistent with the production of alcohol. In 2007, appellant pleaded guilty to possession of alcohol. In 2008, appellant again participated in a racial riot. In 2009, he was again found

guilty of fermentation or distillation of materials consistent with the production of alcohol.  Later that same year, appellant was found guilty of conspiracy to commit battery on an inmate, after prison authorities confiscated a note indicating that appellant had relayed orders from leaders of the Aryan Brotherhood and Nazi Low Riders to attack Black inmates.  A Black inmate was assaulted as a result of these orders.  Based on this evidence, prison authorities concluded that appellant held a leadership position within the White prison-gang system.

In 2011, appellant was found guilty of participating in a mass disturbance, due to his participation in a hunger strike while in solitary confinement.  He again participated in a hunger strike in 2013.  Finally, in 2016, appellant tested positive for amphetamines, methamphetamine, morphine, and codeine.

### 2. *Appellant's Evidence*
#### a.   *Rehabilitative Programs*

In 2014, appellant obtained his GED, and in 2016, he completed 48 units of correspondence courses.  Appellant was in solitary confinement for six years and had no work assignment during that time, but he began working as a prison barber following his transition into general population in 2015.  He participated in Narcotics Anonymous and Alcoholics Anonymous and became involved in the Going Out by Going In program, which teaches inmates to understand their personality defects and

instructs them on how to cope with difficulties without resorting to substance abuse.  He also participated in the PREP Turning Point program, and planned to complete the program at a PREP residential facility upon his release.

### b.  *Release Plans*

Upon release from prison, appellant intended to enter PREP Turning Point's residential program, which would provide housing at a program facility, drug counseling, job preparation assistance, and other services intended to increase the chances of his successful reentry into society.  In response to the court's inquiry, appellant also expressed willingness to serve a year in the Male Community Reentry Program (MCRP).  This program allows eligible inmates to serve the last year of their sentence in the community rather than a prison, and provides rehabilitative services in areas such as substance abuse treatment, mental health care, employment services, and education.  (CDCR, Male Community Reentry Program <https://www.cdcr.ca.gov/rehabilitation/mcrp/> [as of July 9, 2021].)  Appellant would have the support of his wife, who is employed and owns a home.  Additionally, appellant had a job offer in construction.

### c.  *Testimony of Richard Subia*

Appellant called Richard Subia, a former acting director of the CDCR, as an expert on prison operations and risk assessment in custody and in the community.  Subia

7

reviewed appellant's file and interviewed him before the hearing. Subia testified about the evidence and circumstance relating to appellant's disciplinary violations based on CDCR records. He also testified about appellant's rehabilitative efforts in prison and his release plan, as detailed above.

According to Subia, appellant disavowed his connection with the Nazi Low Riders in 2009, and his current placement in general population suggested that authorities believed he was an inactive associate. Subia opined that CDCR records indicating appellant remained an active associate resulted from an "input error."

Based on appellant's records, Subia testified that appellant had managed to remain free of drug use for years, and that appellant's use of drugs in 2016 constituted a single relapse, which is common for recovering substance abusers. He stated that appellant's continued participation in recovery programs and the lack of subsequent positive drug tests were encouraging signs. Based on the information available to him, Subia opined that appellant's resentencing would not pose an unreasonable risk of danger to public safety.

### d. *Testimony of Dr. Goodwin*

Dr. Ronette Goodwin, a psychologist specializing in forensic mental health, also testified on behalf of appellant. Dr. Goodwin reviewed appellant's records, interviewed him in February and March 2018, and conducted several tests to

8

assess his risk levels. She testified that appellant's assessment indicated the presence of "criminal thinking" and reflected an impulsive and impetuous thinking style. She opined that appellant's thinking style, together with his drug use, likely contributed to his past criminal behavior. Regarding appellant's drug use, Dr. Goodwin revealed that appellant had told her he had been drug free for six months at the time of their interview. Dr. Goodwin did not recall if appellant said this in February or March 2018.

Dr. Goodwin identified appellant's coping skills and his ability to handle stress as areas of concern. According to Dr. Goodwin, appellant attributed his drug use in 2016 to his difficulty in adjusting to being around other inmates after his release from solitary confinement. In response to questioning by the prosecutor, Dr. Goodwin agreed that release from prison and reintegration into society also required an adjustment and caused stress.

Dr. Goodwin testified that appellant's assessments indicated he represented a medium risk for recidivism and violence, primarily due to his early history and criminal lifestyle. She explained that appellant's assessment score of 19 was the highest within the medium-risk range and was associated with a 28 percent chance of recidivism within one year.

Based on her assessment of appellant, Dr. Goodwin opined he was suitable for resentencing, but this conclusion was conditioned on a more structured discharge plan that addressed areas of concern. She characterized appellant's

current transitional plan as "weak." Dr. Goodwin opined that appellant needed at least six months to a year of treatment and intervention relating to his thinking styles and drug addiction, prior to release. She explained he needed training to develop his skills in areas such as patience and emotional control, critical reasoning skills, and goal setting. According to Dr. Goodwin, excluding appellant's criminal history from consideration would result in a low-risk assessment, assuming implementation of her recommendations for a better release plan.

### C. *The Superior Court's Ruling*

Following the suitability hearing, the superior court denied appellant's petition, concluding his resentencing would pose an unreasonable risk of danger to public safety. The court reasoned: (1) appellant's extensive criminal history indicated a propensity for violence; (2) his prison misconduct, which also included violent conduct, showed he continued to struggle with substance abuse, which was particularly concerning given Dr. Goodwin's opinion that drug use contributed to his criminal behavior in the past; and (3) based on Dr. Goodwin's testimony, appellant's release plan was inadequate. Appellant timely appealed.

## DISCUSSION

Appellant contends the superior court abused its discretion in determining that resentencing him would pose an unreasonable risk of danger to public safety, and thus

10

that he was unsuitable for resentencing under section 1170.126.  We disagree.

### A. *Principles*

In 2012, the electorate approved Proposition 36, amending the Three Strikes law to provide that absent specified exceptions, an offender with two or more prior strikes is to be sentenced as a two-strike offender unless the new offense is itself a serious or violent felony.  (*People v. Yearwood* (2013) 213 Cal.App.4th 161, 169-170.)  Proposition 36 also added section 1170.126, creating a postconviction resentencing proceeding for specified inmates sentenced under the prior version of the Three Strikes law.  (*People v. Yearwood*, at 170-171.)  Under that statute, a defendant sentenced as a three-strike offender may petition for recall of the sentence and for resentencing, subject to certain eligibility criteria. (§ 1170.126, subd. (e).)

If a petitioner is eligible for resentencing under Proposition 36, the superior court may still deny his or her petition if the court, "in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety."  (§ 1170.126, subd. (f).)  In exercising this discretion, the court may consider:  (1) the petitioner's criminal conviction history; (2) the petitioner's "disciplinary record and record of rehabilitation while incarcerated"; and (3) any other evidence the court, in its discretion, determines to be relevant.  (§ 1170.126, subd. (g).)  "The proper focus is on whether the petitioner currently

11

poses an unreasonable risk of danger to public safety." (*People v. Buford* (2016) 4 Cal.App.5th 886, 913 (*Buford*).) In assessing the petitioner's criminal and disciplinary history, ""[t]he relevant inquiry is whether . . . , when considered in light of other facts in the record, [they] are such that they continue to be predictive of current dangerousness many years [later]."" (*Id.* at 914.) ""[T]he facts upon which the court's finding of unreasonable risk is based must be proven by the People by a preponderance of the evidence."" (*People v. Piper* (2018) 25 Cal.App.5th 1007, 1016.)

On appeal, the court's determination that resentencing would pose an unreasonable risk of danger to public safety is reviewed for an abuse of discretion. (*Buford*, *supra*, 4 Cal.App.5th at 895.) We will find such an abuse only if the court exercised its discretion in an arbitrary, capricious, or patently absurd manner. (*Id.* at 895, 901.)

### B. *Analysis*

The superior court did not abuse its discretion in determining that appellant's resentencing would pose an unreasonable risk of danger to public safety. Appellant's criminal history, his disciplinary record, and other factors supported the court's decision.

Appellant's criminal history was extensive and his criminality persistent, stretching from 1985, when he was 16 years old, to his commitment offenses in 1999. His prior convictions included violent and other dangerous offenses, including two batteries (in 1987), two burglaries (1990 and

12

1991), evading a peace officer with willful disregard for the safety of persons or property (1990), two assaults with a deadly weapon (1992), and inflicting corporal injury on a spouse, resulting in great bodily injury (1997). Appellant also violated probation and parole on multiple occasions. Appellant's 1999 commitment offenses, unlawful driving and evading the police with willful disregard for the safety of persons or property, involved driving more than 70 miles per hour in a 25-miles-per-hour residential area and ultimately attempting to jump out of the moving vehicle.

Appellant's record during his current incarceration exhibited a continuation of rule-breaking behavior, even in the controlled environment of a prison. Appellant was long associated with the Nazi Low Riders. CDCR records indicated he remained an active associate, although Subia, appellant's prison-operations expert, testified that appellant's current placement suggested authorities believed he was inactive. Appellant committed numerous disciplinary violations, including violations related to racial violence. His record included participating in two racial riots in 2001 and 2008. In 2009, appellant was found guilty of conspiracy to commit battery on an inmate, after prison authorities confiscated a note indicating that appellant had sent out orders for White inmates to attack Black inmates on behalf of White prison gangs. These orders resulted in the assault of a Black inmate. Based on this evidence, prison authorities concluded that appellant held a leadership position within the White prison-gang system.

13

Appellant's disciplinary record additionally indicated that appellant continued to abuse drugs and alcohol in prison. He sustained three violations relating to the production or possession of alcohol in 2004, 2007, and 2009. In 2004, officers intercepted a letter addressed to appellant containing a greeting card soaked in methamphetamine. In 2016, appellant tested positive for amphetamines, methamphetamine, morphine, and codeine. Moreover, according to the testimony of Dr. Goodwin, appellant admitted using drugs in 2017, but his drug use went undetected.

Dr. Goodwin's testimony showed that appellant's criminal and disciplinary history reflected a continuing risk. Testifying on appellant's behalf, Dr. Goodwin opined that appellant represented a medium risk for recidivism and violence. She explained that appellant's risk-assessment score was the highest within the medium-risk range and was associated with a 28 percent chance of recidivism within one year. Dr. Goodwin stated that appellant's assessment indicated the presence of "criminal thinking" and reflected an impulsive and impetuous thinking style. She opined that appellant's thinking style, together with his drug use, likely contributed to his criminal behavior. Dr. Goodwin expressed concern regarding appellant's coping skills and his ability to handle stress. According to Dr. Goodwin, appellant attributed his drug use in 2016 to his difficulty in adjusting to being around others after being released from solitary confinement. In response to questioning, she agreed that

14

release from prison and reintegration into society also required an adjustment and caused stress.

Based on her assessment of appellant, Dr. Goodwin opined he was suitable for resentencing, but conditioned her conclusion on a more structured discharge plan that addressed areas of concern. She testified that appellant needed at least six months to a year of treatment dealing with his thinking styles and drug addiction, prior to release. She further testified that appellant needed training aimed at developing his skills in areas such as patience and emotional control, critical reasoning skills, and goal setting. Dr. Goodwin characterized appellant's current transitional plan as "weak."

Dr. Goodwin's testimony contextualized appellant's criminal and disciplinary misconduct and established its roots in appellant's personal characteristics and drug abuse. Together, this evidence supported the finding appellant posed a current unreasonable risk of danger to public safety. (See *Buford*, *supra*, 4 Cal.App.5th at 913-914.) Given appellant's troubling criminal and disciplinary history and Dr. Goodwin's testimony about the inadequacy of his release plan in relation to his risk factors, the superior court's denial of his petition was eminently reasonable.

Appellant contends his record contained only isolated evidence of past dangerousness that, in view of the totality of his circumstances, did not support the superior court's finding of current dangerousness. He notes that he was 51 years old at the time of the hearing and had been free of any

15

gang-related activity or violent violations for about ten years. He also contends that "[w]ith the exception of a single relapse in 2016, [he] ha[d] successfully overcome his drug and alcohol abuse for at least 11 years."

Contrary to appellant's characterization, the record supports a persistent pattern of criminal and disciplinary misconduct, including violent behavior, both before and during his current incarceration. This pattern was, according to appellant's own expert, linked to his criminal and impulsive thinking styles, as well as to his substance abuse. And although appellant's record shows a reduction in serious rule-breaking behavior in prison during the years preceding the suitability hearing, it also suggests that appellant has not sufficiently addressed the root causes of his conduct. While appellant points to positive markers -- and we hope that his trend of improvement in his conduct continues -- the superior court was not bound to find them dispositive in the face of significant evidence of appellant's dangerousness. (See *Buford, supra*, 4 Cal.App.5th at 895, 901.) We note, moreover, that by appellant's own admission to Dr. Goodwin, his drug use continued beyond 2016, without being detected by prison authorities, and it is not apparent that he had in fact "overcome" his drug-abuse issues by the time of the suitability hearing.

Appellant claims the superior court failed to consider his youth at the time he committed most of his violent conduct: "The record shows most of appellant's acts of violence . . . occurred when he was 25 years old or younger.

16

The one exception is appellant's conviction for physically abusing his former wife at the age of 26.  [¶]  In finding that appellant's criminal history as a youth made him a current risk of danger 25 years later[, the court] fail[ed] to consider the impact of his minority in assessing his culpability." However, appellant's argument omits his significant violent or otherwise dangerous conduct well beyond the age of 25, both before and during his present incarceration.  He committed his offenses of commitment -- involving a reckless attempt to flee from police at a high speed through a residential area -- at age 29.  He then participated in racial riots in prison at ages 32 and 39, and at age 40, he relayed orders for White inmates to attack Black inmates.

Finally, appellant maintains the court erred in deeming his release plan insufficient.  He cites caselaw dealing with parole decisions, holding that an inmate need not provide ironclad post-release plans, only realistic ones. (See *In re Twinn* (2010) 190 Cal.App.4th 447, 465; *In re Andrade* (2006) 141 Cal.App.4th 807, 817.)  Appellant argues he indeed proffered a realistic plan, noting his admission to a residential transition program, the job offer he received, and the support of his spouse.  He repeats his contention that he has been drug free since his 2016 relapse and contends that the superior court could have addressed any remaining concerns about his continued drug use through MCRP, in which he agreed to participate, or by requiring frequent drug tests as a condition of parole.  We are unpersuaded.

17

By appellant's own expert's account, his release plan was "weak," and it failed to address the core reasons for his past criminality and rule-breaking behavior. His plan did not include lengthy pre-release intervention relating to his problematic thinking styles and drug addiction, which Dr. Goodwin opined was necessary for him to be suitable for resentencing. The mandatory drug testing suggested by appellant would serve as no substitute for this kind of intervention, as it fails to address his thinking patterns and coping skills. Moreover, appellant has used drugs without detection even in the controlled prison environment, and random drug testing following release would not ensure that he would be detected before recidivating. As to MCRP, the record contains insufficient information about this program, and it does not appear that Dr. Goodwin assessed its suitability to reduce appellant's risk profile. Moreover, while appellant agreed to participate in the program, he makes no attempt to show that he would have been eligible to participate. In short, the superior court was well within its discretion in determining that appellant's resentencing would pose an unreasonable risk of danger to public safety.

## DISPOSITION

The superior court's order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, P. J.


We concur:


WILLHITE, J.


COLLINS, J.