Filed 9/2/22  In re Harris CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re KENNETH HARRIS<br><br>on Habeas Corpus. | C094722<br><br>(Super. Ct. No. 20HC00384) |

Petitioner Kenneth Harris was convicted of second degree murder and sentenced to a term of 15 years to life in state prison.  In 2019, the Board of Parole Hearings (Board) denied petitioner parole, finding he continued to pose an unreasonable risk to public safety.  Petitioner filed a petition for a writ of habeas corpus challenging the Board's decision and the trial court granted the petition.  The Attorney General appeals, arguing the Board's decision was supported by sufficient evidence.  We conclude adequate evidence supported the Board's finding of current dangerousness and reverse the trial court's order granting the petition for writ of habeas corpus.

1

## FACTUAL AND PROCEDURAL BACKGROUND

*The Life Crime*[1]

In 1986, petitioner killed the victim, whom he had been dating, after she broke up with him. The murder occurred two weeks after a separate incident in which petitioner had struck the victim, breaking her jaw and a bone under her eye socket. On the day of the murder, petitioner entered the victim's apartment while she was not home, drank a large bottle of wine and other alcohol, and waited for the victim to return. When the victim arrived at the end of the day, she spoke with petitioner, then said she was going to leave. Petitioner choked the victim several times and with various implements before finally strangling her to death. Petitioner had been using PCP every day in the two years prior to the murder, and on the day of the murder, had smoked a PCP cigarette prior to killing the victim. Petitioner attributed his criminal activity to his alcohol and drug use, citing several previous convictions for driving under the influence. Petitioner pleaded guilty to second degree murder and the trial court sentenced him to a 15-year-to-life term.

*2014 Parole Decision*

In 2014, the Board denied petitioner parole. The Board credited petitioner for his lack of violent crime as a juvenile, his stable social history growing up, his age, his self-help programming, and positive reports and vocational training in his file. Balanced against those factors, however, were the aggravating factors associated with the murder. In addition, petitioner had two rules violation reports (RVR's):[2] one in 2008 for possession of a cell phone and one in 2011 for falsifying records. Petitioner had seven

---

[1] As petitioner did not appeal his underlying conviction, we take the facts of that case from the probation report prepared for his initial sentencing hearing.

[2] An RVR, or "115," is a report of misconduct that "is believed to be a violation of law or is not minor in nature." (Cal. Code Regs., tit. 15, § 3312, subd. (a)(3).)

RVR's and seven "128A's"[3] over the course of his incarceration; the recency and context of the 2008 and 2011 violations concerned the Board. In particular, petitioner had attempted to blame a clerical employee for the falsified record and did not take responsibility for the rule violation.

The Board said petitioner lacked insight into the causative factors of the murder. Specifically, petitioner's description of the crime did not align with the facts in the record, and he was unable to explain what triggered the crime. The Board felt this lack of insight into what motivated petitioner to commit the crime, and petitioner's lack of remorse for his actions, were a direct nexus to his current dangerousness. The Board believed petitioner was at risk of repeating similar violent behavior. Petitioner also downplayed the role that drugs and alcohol had played in the murder, did not have future plans to participate in substance abuse treatment, and had difficulty accepting responsibility. The Board also expressed concern with petitioner's failure to acknowledge that his involvement in domestic violence was a causative factor in the murder. Despite having participated in various programs while in prison, petitioner had largely stayed away from courses on domestic violence and family relationships. In denying parole, the Board recommended petitioner: avoid any further discipline; participate in substance abuse, domestic violence, and conflict resolution programming; and maintain up-to-date parole plans.

*Comprehensive Risk Assessment*

In 2019, Dr. Charles Odipo, a forensic psychologist, examined petitioner. Dr. Odipo noted that petitioner had a history of alcohol abuse, particularly in his relationship with the victim, whom he originally met while completing community service for his

---

[3] A 128A is a report of "minor misconduct [that] reoccurs after verbal counseling" or for which documentation is otherwise needed. (Cal. Code Regs., tit. 15, § 3312, subd. (a)(2).)

driving under the influence convictions. Petitioner had six arrests for driving under the influence between 1981 and 1985. Petitioner had completed some substance abuse related course work in the past, but the work would need to be sustained. Although petitioner stated he had not used drugs or alcohol in 25 years, petitioner had received multiple substance abuse related disciplines for refusing to test while in prison.

Although he had an extensive criminal history, the conviction for the murder resulted in his first prison term. Petitioner previously had difficulty complying with conditions of supervised release and was on probation at the time of the murder. Dr. Odipo reported petitioner had previously been examined in a comprehensive risk assessment in 2010, which concluded petitioner presented "a moderate risk for violence due to his limited insight into the causative factors in the life crime."

Since the 2010 assessment, petitioner had received multiple RVR's, including one in 2018 for possession of a cell phone, one in 2018 for possession of drug paraphernalia, two in 2017 for refusing to provide urine samples for drug testing, and one in 2016 for use of a controlled substance based on a positive drug test. Petitioner had also received a 128A in 2014 for possessing stolen state property. Petitioner ascribed the positive drug test to prescription drugs he had been using for hip and back problems, and said he refused further drug tests because the drug test was inaccurate. None of petitioner's discipline was related to "violent outbursts, physical aggression or verbal threats."

Petitioner had worked in prison in a variety of jobs and had completed several vocational skills classes. Since the 2010 assessment, he had completed a variety of programming, including a substance abuse and anger management, and had created a juvenile diversion and peer counseling program. If he were released, petitioner planned to live with his sister, "go to meetings, sponsor, [and] be around people who have my best interests at heart." Dr. Odipo observed that "given [petitioner's] long history of substance misuse in the community and prison, and specifically the life crime, it may be

4

beneficial for him to continue with substance abuse treatment upon release. He will need to continue to firm up his substance abuse relapse prevention plans."

Analyzing petitioner's risk factors, Dr. Odipo explained many of petitioner's disciplinary issues reflected "resistive behavior," petitioner would need to "demonstrate ongoing prosocial behaviors for a protracted period of time while in the free community," and "relationship problems will continue to be present and moderately relevant when he is released." Petitioner's understanding of his "antisocial attitudes, beliefs and subsequent behaviors" had improved, although he had continued to receive substance related disciplinary reports.

Noting petitioner's substance abuse programming had "occurred in a controlled environment" and that his "past performance on supervised release has been poor," Dr. Odipo felt petitioner would need to continue treatment "given the extremely negative impact of alcohol in his criminal history. He needs to demonstrate ongoing substance abuse treatment for example for a protracted period of time while in the free community since substance misuse led to his antisocial behaviors. Furthermore, his past issues with impulsivity and instability, poor frustration tolerance suggest that problems with treatment and supervision remain relevant in his risk for future violence." Additionally, Dr. Odipo felt that petitioner would need to "demonstrate the potential to appropriately manage stressors and utilize coping skills on an ongoing basis in prison. He will need to participate in structured programs that address history of criminal behavior, impulsivity and particularly substance abuse."

Although petitioner did not yet qualify for consideration as an elder parolee, Dr. Odipo incorporated his advanced age into the analysis. The assessment also discussed petitioner's youthful offender characteristics because petitioner was 25 years old at the time of the murder. Although petitioner reported that he had since become more emotionally aware and his insight into his addiction and the murder had increased, his

pattern of discipline in prison suggested he "needs to continue to learn more adaptive ways of managing stressors and utilizing coping skills."

Dr. Odipo concluded petitioner represented a moderate risk of violence. He considered a high-risk rating based on petitioner's recent RVR's, but reduced it given petitioner's age, lack of violent behavior in prison, and increasing insight into the relationship between substance abuse and criminal behaviors.

*2019 Parole Hearing and Decision*

At the 2019 parole hearing, petitioner discussed his history of substance abuse and attributed the murder to "selfishness," "stupidity," "drug dependence, alcohol dependence, [and] an inability to . . . communicate my needs." Petitioner noted he had taken college courses, worked in a variety of jobs, and had trained in a number of vocations while in prison.

As to the 2018 RVR for possession of a cell phone, petitioner stated he had the phone because he needed it to communicate with his dying father. He said he could not use the state-provided phones because the hospital and hospice phones would have to be set up for the calls to take place, but admitted he had not investigated whether that could be done. On further questioning, petitioner stated his father had died in November 2017, although he was caught with the cell phone in December 2018. Petitioner explained he was unable to get rid of the phone after his dad died.

The 2018 RVR for possession of drug paraphernalia involved a smoking pipe that had fallen out of a blanket on petitioner's walker. Petitioner said it was not his. Petitioner explained the drug test RVR's by saying he had tested positive for methamphetamine, then refused to test later because he believed the test result was incorrect. Petitioner explained the 128A, which involved a DVD player found inside his laundry bag, as a result of psychotropic drugs he was taking, saying he did not know how it had happened.

6

The Board noted petitioner had completed a substance abuse program. He had not taken a victim impact or awareness program, and had completed two book reports on domestic violence topics. However, when questioned by the Board, petitioner was unable to answer questions about the dynamics of domestic violence. He could not describe his relapse plan for avoiding domestic violence and had not updated his plan since the last parole hearing.

Petitioner explained that his triggers for substance abuse included being around drugs or alcohol or people who use drugs or alcohol. He recalled participating in Narcotics Anonymous in 1993, and was able to identify step four of the 12-step process when asked. Petitioner had not updated his substance abuse rehabilitation plan since the previous hearing, saying he had no confidence in the parole process.

The Board and petitioner then had a series of contentious exchanges. Petitioner explained that although he had not done everything the Board had asked him to do since the last hearing, he had previously done everything requested and had many positive chronos in his file. The Board said that petitioner did not seem to understand basic domestic violence concepts and that understanding domestic violence was important so that domestic violence crimes would not reoccur. The Board noted petitioner's continuing drug use. Petitioner cited his lack of violent conduct, and the Board noted he had been in prison, and had been unable to engage in domestic violence. The Board stated that petitioner's age and time spent in prison were not enough to show a lack of dangerousness, and that he would also need to demonstrate his rehabilitation.

The Board found petitioner was not suitable for parole and posed an unreasonable current risk of danger to society if released. As an initial matter, the Board stated petitioner qualified as a youthful offender under Penal Code[4] section 3051, and that it

---

[4] Undesignated statutory references are to the Penal Code.

7

would give great weight to the factors set forth in that section. In finding petitioner unsuitable, the Board explained that petitioner continued to use drugs and exhibit serious misconduct in prison, as shown by petitioner's recent RVR's, which suggested petitioner still had "the same issues" he had at the time of the murder.

More particularly, the Board articulated that petitioner lacked understanding and insight into his own "criminal thinking and conduct," as demonstrated by the RVR's. Petitioner minimized his responsibility for the RVR's. Although he blamed substance abuse for the murder, he had not participated in extensive substance abuse training to the point that he would not "resort to the use of drugs and alcohol" again. The Board felt petitioner had not engaged in nor internalized meaningful self-help programming to address his issues with domestic violence, and petitioner's general anger management programming was insufficient to address specific domestic violence concepts. The Board did not find petitioner credible with respect to his statements about the RVR's and the causative factors for the murder. The Board concluded these factors indicated petitioner would have difficulty complying with parole conditions, such as treatment, and made it likely petitioner would reoffend if released.

The Board noted Dr. Odipo's risk assessment and observed that it had taken petitioner's youth offender status, including his subsequent growth and maturity, into account, but still found petitioner represented a moderate risk of reoffending. Notably, petitioner had received similar recommendations about avoiding RVR's and seeking domestic violence programming from previous parole hearings as far back as 1995.

The Board commended petitioner on his programming efforts but was concerned he had not internalized the tenets of the programming. As a result, the Board recommended petitioner seek programming on domestic violence, as well as denial management, because he seemed to "have a story for every rules violation." Specifically, the Board voiced concern that, without domestic violence training, petitioner could "repeat the life offense."

8

*Trial Court Decision*

Petitioner filed a petition for writ of habeas corpus in the trial court. The trial court construed the Board's comment that it expected disciplinary-free behavior to mean that the Board was imposing a per se ban on parole for inmates with a disciplinary history, and determined the Board had failed to conduct an individualized inquiry into petitioner's suitability for parole. The RVR's did not show petitioner would present an unreasonable risk if released. The court noted petitioner had been violence free in prison, had taken many other programs, and had demonstrated insight into domestic violence. Thus, the trial court found that the Board had not articulated a rational nexus between petitioner's insufficient programming and current dangerousness. The court also disputed the Board's characterization of the RVR's as demonstrating a similar mental state to the murder, saying the characterization showed the "Board's arbitrary decision-making process." Finally, the court noted the Board had not given great weight to petitioner's youthful offender status and his current advanced age. The court concluded the Board's "decision to deny parole is not supported by 'some evidence' " and ordered the board to conduct a new hearing.

The Attorney General appealed.

## DISCUSSION

The Attorney General argues that at least some evidence supports the Board's determination that parole would pose an unreasonable risk to public safety. In particular, the Attorney General points to petitioner's recent history of RVR's, lack of insight, and petitioner's lack of sufficient rehabilitative treatment, and says these factors show petitioner would have difficulty complying with parole conditions and could become a repeat offender. We agree.

"The granting of parole is an essential part of our criminal justice system and is intended to assist those convicted of crime to integrate into society as constructive

9

individuals *as soon as possible* and alleviate the cost of maintaining them in custodial facilities." (*In re Vasquez* (2009) 170 Cal.App.4th 370, 379.) "[T]he Board is the administrative agency within the executive branch that generally is authorized to grant parole and set release dates. [Citations.] The Board's parole decisions are governed by section 3041 and title 15, section 2281 of the California Code of Regulations." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1201-1202, fn. omitted.) Release on parole is the rule, rather than the exception. (*Id*. at p. 1204.)

When making the parole suitability determination, the Board must consider all reliable, relevant information that bears on the inmate's suitability for release. (*In re Twinn* (2010) 190 Cal.App.4th 447, 461; *In re Gomez* (2010) 190 Cal.App.4th 1291, 1304; Cal. Code Regs., tit. 15, § 2402, subd. (b).) Such information includes, "the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Cal. Code Regs., tit. 15, § 2281, subd. (b); see also *id.*, § 2402, subd. (b).)

The Board's regulations also list factors showing suitability and unsuitability for parole. (Cal. Code Regs., tit. 15, §§ 2402, subds. (c) & (d), 2281, subds. (c) & (d).) These suitability factors are only intended to provide "general guidelines," not an exclusive or binding list. "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*In re Lawrence, supra*, 44 Cal.4th at p. 1212; see also *In*

10

*re Twinn, supra*, 190 Cal.App.4th at p. 463.) Thus, "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Cal. Code Regs., tit. 15, § 2402, subds. (c) & (d).) "[T]he fundamental consideration in parole decisions is public safety," and "the core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's *current* dangerousness." (*In re Lawrence*, at p. 1205.)

On review of the Board's parole suitability determination, we focus on whether there is " 'some evidence' demonstrating that an inmate poses a current threat to public safety, rather than merely some evidence suggesting the existence of a statutory factor of unsuitability." (*In re Shaputis* (2011) 53 Cal.4th 192, 209 (*Shaputis II*).) Under this standard of review, the Board's "interpretation of the evidence must be upheld if it is reasonable, in the sense that it is not arbitrary, and reflects due consideration of the relevant factors." (*Id.* at p. 212.) "Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor." (*Id.* at p. 211.) On review, we do not consider whether the inmate is currently dangerous, only "whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness." (*Id.* at p. 221.)

Here, the Board characterized its primary rationale for denying parole as petitioner's lack of significant insight into the causes of the murder and his current conduct. A lack of insight into past criminal conduct can reflect an inability to recognize the circumstances that led to the commitment crime. Such an inability can imply that the inmate remains vulnerable to those circumstances and, if confronted by them again, would likely react in a similar way. (*In re Shaputis* (2008) 44 Cal.4th 1241, 1260-1261 & fn. 20 (*Shaputis I*); *In re Lawrence, supra*, 44 Cal.4th at p. 1228.) A parole authority may consider a petitioner's limited understanding of his or her crime and the ways in which he or she could avoid future antisocial acts if released on parole. (*Shaputis II,*

11

*supra*, 53 Cal.4th at pp. 217-218 [the inmate's "degree of insight" into his or her criminal behavior is a factor in parole suitability determinations].)  Although petitioner identified a number of potential causes for the murder, including "selfishness," "stupidity," and substance abuse, the Board determined petitioner was unsuitable for parole because he did not appear to have adequately internalized or remedied the causative factors for the crime, including his substance abuse and "criminal thinking."  At least some evidence supports this conclusion.

Petitioner was abusing drugs and alcohol at the time of the murder.  He had a history of substance abuse and had multiple substance abuse related convictions. Petitioner attributed much of his criminal activity to substance abuse.  Dr. Odipo's comprehensive risk assessment also noted an extensive history of substance abuse, explaining, "substance misuse appears to be a setting and exacerbating event for [petitioner's] criminal activity."

The circumstances of the murder also included some criteria for antisocial personality disorder, in that petitioner lacked remorse and rationalized having hurt, mistreated, or stolen from another.  Dr. Odipo explained that petitioner had "pervasive antisociality characterized by poor impulse control, recklessness, and consistent irresponsibility."

While incarcerated, petitioner struggled with rule violations, including substance abuse related infractions.  Between the 2014 hearing and the 2019 hearing, petitioner received multiple RVR's and one 128A.  Although none of the RVR's were for violence, several were related to substance abuse, including a 2018 RVR for possession of drug paraphernalia (a smoking pipe), at least one 2017 refusal to provide a urine sample for a drug test, and a positive drug test in 2016.[5]  These violations suggested petitioner was

_____

[5]  Dr. Odipo's assessment identifies two RVR's for refusing to submit to drug tests, but the hearing transcript appears to mention only one.

still abusing substances, despite completing substance abuse treatment programming and residing in an institutional setting.

Petitioner failed to accept responsibility for each of his RVR's. For instance, he said he had possessed a contraband cell phone because he needed it to talk to his ailing father, but later acknowledged he had not explored other options to speak with his father, and had kept the cell phone after his father had died. Likewise, petitioner disclaimed responsibility for the substance abuse RVR's, saying the smoking pipe was not his and the positive drug test he had received was inaccurate. He told Dr. Odipo that the drug test was the result of medication he was taking for hip and back pain, and similarly told the Board that the 128A he received, for possession of state property, had occurred because of psychotropic medication. The Board found these explanations not credible, and concluded petitioner's explanations were attempts to minimize his own culpability.

Dr. Odipo explained that petitioner's antisociality interacted with petitioner's relationship problems and substance abuse to "increase[] his risk for violence and criminal behavior." Although petitioner had expressed some understanding "on the surface" of his behaviors and how to control them, he still had many RVR's. As a result, Dr. Odipo opined, "[petitioner's] past issues with impulsivity and instability, [and] poor frustration tolerance suggest that problems with treatment and supervision remain relevant in his risk for future violence." Thus, petitioner's "antisocial behavior, substance abuse, relationship problems, substance use and treatment" interacted in "significantly negative ways . . . increasing his risk for violence and criminal behavior."

All of this was evidence that many of the factors related to petitioner's commission of the murder, including substance abuse and antisociality, or "criminal thinking," as characterized by reckless, impulsive behavior and an inability to take responsibility for his actions, and continued to be issues with which petitioner was struggling. The Board explained that this indicated current dangerousness because it "increases the likelihood of noncompliance with treatment and parole in the community

13

and does predispose one to repeat past mistakes." This reasoning makes sense; evidence of current substance abuse and antisociality, when paired with a crime that was related to both, suggest petitioner had not resolved the causative factors of the murder, placing him at risk of future criminal behavior. (*In re Montgomery* (2012) 208 Cal.App.4th 149, 163 [tobacco possession RVR evidence that the petitioner "has not adequately addressed the triggers for his tobacco addiction," forming rational nexus to current dangerousness "[i]n the context of a life crime in which addiction played . . . a significant role"]; *In re Reed* (2009) 171 Cal.App.4th 1071, 1084 [128A "provided some evidence [the petitioner] was unsuitable for parole because he would not comply with the reasonable conditions of parole"].)

We disagree with petitioner that the lack of violence in the RVR's means that there was no link between the RVR's and the murder or that they did not share a common "mental state." The Board's statement that petitioner's "present mental state is similar to the mental state at the time of the life crime" is followed by an explanation that petitioner consistently minimized his culpability as to the RVR's and his substance abuse problems. The "mental state," or "criminal thinking" the Board describes thus related to petitioner's history of substance abuse and antisocial characteristics, such as his reckless behavior or inability to take responsibility. Petitioner's pattern of thinking and substance abuse provided the nexus to current dangerousness, and violence in the RVR's was not necessary to establish such a nexus.

The Board's conclusion was also supported by petitioner's lack of programming and dated relapse plans, which it cited as issues at the hearing. As Dr. Odipo explained, substance abuse and relationship problems contributed to petitioner's risk for violence and criminal behavior. The Board had previously recommended that petitioner participate in programming for substance abuse and domestic violence, as well as maintain up-to-date parole plans. Although petitioner did participate in a substance abuse treatment program, there was evidence that training had not translated into his behavior,

14

based on the substance abuse RVR's. (*Shaputis I, supra*, 44 Cal.4th at p. 1260 [absence of results from programming, despite history of programming, evidence of unsuitability].)

Similarly, despite over 20 years of recommendations that he engage in domestic violence programming, petitioner's programming on the subject was limited to two book reports and he was unable to meaningfully respond to questions about the motivation for domestic violence, like the need for power and control, or the cycle of violence inherent in domestic violence relationships. He similarly had not updated his plans to avoid domestic violence or to seek substance abuse treatment. And the comprehensive risk assessment explained that, given petitioner's poor past performance on supervised release, whether he received "ongoing substance abuse treatment" was a relevant factor in his "risk for future violence." As a result, there was some evidence that petitioner's lack of sufficient programming had a rational nexus to current dangerousness.

Finally, we are not persuaded by petitioner's argument the Board failed to consider his current advanced age and youthfulness at the time of the offense. The comprehensive risk assessment included a discussion of both factors, and the Board considered petitioner's growth and maturity when it reviewed the assessment, petitioner's history of parole hearings since 1995, and his subsequent lack of adherence to institutional rules.

In reviewing the Board's parole decision, we are constrained to consider only whether some evidence supports the decision, not whether the Board could have come to some other conclusion. (*Shaputis II, supra*, 53 Cal.4th at p. 210.) We conclude some evidence supports the Board's finding that petitioner lacked insight into the causative factors of the murder, and that this lack of insight had a rational nexus to current dangerousness.

15

## DISPOSITION

The trial court's order granting writ of habeas corpus is reversed. The trial court is directed to enter a new order denying writ relief.

/s/
————————————————
EARL, J.

We concur:


/s/
————————————————
MAURO, Acting P. J.


/s/
————————————————
DUARTE, J.